**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**JONESBORO DIVISION**

**BARRY GOODMAN**                                                                                          **PLAINTIFF**

v.                                              3:09CV00011-WRW

**HARTFORD LIFE & ACCIDENT**                                                          **DEFENDANTS**
**INSURANCE COMPANY,** *et al*.

**ORDER**

Pending are Plaintiff's Motion for Summary Judgment (Doc. No. 15), and Defendants' Motion for Summary Judgment (Doc. No. 18). The parties have responded.[1] For the reasons set out below, Defendants' Motion is GRANTED, and Plaintiff's Motion is DENIED.

**I.      SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided on purely legal grounds.[2] The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.[3]

The Court of Appeals for the Eighth Circuit has cautioned that summary judgment is an extreme remedy that should only be granted when the movant has established a right to the

---

[1] Doc. Nos. 24, 21.

[2] *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987); Fed. R. Civ. P. 56.

[3] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

judgment beyond controversy.[4]  Nevertheless, summary judgment promotes judicial economy by preventing trial when no genuine issue of fact remains.[5]  I must view the facts in the light most favorable to the party opposing the motion.[6]  The Eighth Circuit has also set out the burden of the parties in connection with a summary judgment motion:

> [T]he burden on the party moving for summary judgment is only to demonstrate, *i.e.*,"[to point] out to the District Court," that the record does not disclose a genuine dispute on a material fact.  It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion.  Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue.  If the respondent fails to carry that burden, summary judgment should be granted.[7]

Only disputes over facts that may affect the outcome of the suit under governing law will properly preclude the entry of summary judgment.[8]

## II.   BACKGROUND[9]

Defendant St. Mary's Episcopal School in Memphis, Tennessee (the "School") employed Plaintiff as its Plant Manager. Plaintiff was enrolled in the School's long term disability ("LTD") plan (the "Plan") with Continental Casualty Company ("CNA"). The Hartford acquired CNA's

---

[4]*Inland Oil & Transport Co. v. United States*, 600 F.2d 725, 727 (8th Cir. 1979).

[5]*Id.* at 728.

[6]*Id.* at 727-28.

[7]*Counts v. MK-Ferguson Co.*, 862 F.2d 1338, 1339 (8th Cir. 1988) (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-74 (8th Cir. 1988) (citations omitted)).

[8]*Anderson*, 477 U.S. at 248.

[9]Unless otherwise noted, the facts in the Background section are taken from the parties' statements of undisputed material facts. Doc. Nos. 17, 18, 20, 22.

LTD business sometime in 2003.[10] For the purposes of this Order, The Hartford and CNA are the same.

Plaintiff submitted his claim for LTD benefits on June 21, 2002 -- the last day Plaintiff worked -- citing fatigue associated with Hepatitis C as the primary disabling symptom. Plaintiff's medical records indicate that Plaintiff began feeling intermittent periods of fatigue in 1996. In 2000, Plaintiff was diagnosed with Hepatitis C. Dr. Howard Nease noted that Plaintiff's primary symptom was fatigue.[11]

CNA approved Plaintiff's claim on October 31, 2002. The date of loss for purposes of payment of benefits was June 22, 2002. The Hartford began paying Plaintiff LTD benefits.

The Plan defines disability during the elimination period and the following 36 months as:

> Injury or Sickness [that] causes physical or mental impairment to such a degree of severity that You are: 1. continuously unable to perform the Material and Substantial Duties of Your Regular Occupation; and 2. not working for wages in any occupation for which You are or become qualified by education, training or experience.
>
> After the Monthly Benefit has been payable for 36 months, "Disability" means that Injury or Sickness causes physical or mental impairment to such a degree of severity that You are: 1. continuously unable to engage in any occupation for which You are or become qualified by education, training or experience; and 2. not working for wages in any occupation for which You are or become qualified by education, training or experience.[12]

On April 19, 2003, Plaintiff was awarded Social Security Disability benefits effective June 21, 2002. On April 25, 2003, as a result Plaintiff's Social Security Disability benefits,

---

[10] Doc. No. 16, n.1.

[11] Administrative Record ("AR") 768.

[12] AR 33.

CNA notified Plaintiff that it had overpaid his claim, and requested the overpayment balance of $5,827.39. Plaintiff sent a check to CNA in that amount. From that point forward, Plaintiff's monthly benefits were reduced by his monthly Social Security Disability benefits.

On October 7, 2005, after 36 months of benefits and after a review of Plaintiff's medical records for the most recent 6 months, CNA concluded that "[employee] still remains unable to sustain gainful employment, secondary to side effects and symptoms associated with Hep C."[13]

On June 20, 2006, an anonymous caller told The Hartford that Plaintiff was doing side work -- remodeling homes -- in Memphis, Tennessee, and gave the address of one of the homes that Plaintiff allegedly was remodeling. Plaintiff's claim was then referred to the Special Investigations Unit. Triad Investigations ("Triad") was hired to perform surveillance on Plaintiff to verify Plaintiff's claim. In August, 2006, Triad performed surveillance; the man observed did not act consistently with the physical limitations Plaintiff reported. Triad referred the file for an in-person interview. At the interview in October, 2006, it was determined that the subject of the surveillance was not Plaintiff.[14]

During the interview, Plaintiff was asked numerous questions about his physical abilities. Plaintiff reported that he is able to walk about a block before he gets tired, and that he experiences shortness of breath and has to stop and take it easy.[15] Plaintiff reported it takes him

---

[13] AR 66.

[14] The subject of the surveillance was the man with whom Plaintiff's wife had allegedly been having an affair for more than the past year and a half, and who was allegedly the cause of Plaintiff's bitter divorce. Plaintiff's wife contacted The Hartford and admitted she made a false statement when she reported that Plaintiff had been working. Plaintiff's wife explained that she was trying to retaliate against her husband when she called The Hartford.

[15] AR 396.

about 15 minutes to walk a block and that he walks "very slowly."[16] Plaintiff said he is able to stand for 15 to 20 minutes before he experiences fatigue. He reported: "I'm tired before I start standing but after 15 to 20 minutes of standing, my fatigue increases to the point that I have to get off my feet."[17] Plaintiff stated that he is not able to lift and carry items that weigh less than 10 pounds.

According to Plaintiff, he is able to: bend at the waist without restriction (limited); twist at the waist without restriction (limited); twist his head and neck without restriction; squat without restriction (limited); and kneel without restriction.[18] Plaintiff reported that he is able to push or pull: a shopping cart; a vacuum; luggage on wheels; a business establishment's heavy door; a chair from under a table; and able to scoot furniture around a room without lifting it.[19] Plaintiff stated that he was able to walk up and down stairs, but only because that's where his room is.[20] Plaintiff reported being totally fatigued by the time he walks up the stairs, and that he feels like he's pulling himself up the stairs.[21]

Plaintiff said that he has carpal tunnel syndrome in his right hand and wrist, and that he has bone spurs in his upper back and right hand so his right hand and fingers are numb and tingle

---

[16]*Id.*

[17]*Id.*

[18]*Id.*

[19]*Id.*

[20]*Id.*

[21]AR 396.

all of the time.[22] Plaintiff stated that his grip strength in his right hand is not good enough to open a jar or bottle.[23] Plaintiff can sit in a recliner without restriction, and can concentrate for 30-45 minutes before he becomes fatigued.[24] Plaintiff reported he can drive, but does not drive for long distances.[25] Plaintiff said that any drive over 2 to 3 miles would be a long drive for him, and that he drives only short distances in his community.[26]

Plaintiff described his typical day as getting up, having coffee, making his bed, and watching television.[27] Plaintiff said he would piddle around his rental properties, but did not do any work there beyond maybe picking up things he might see laying in the yard or collecting the rent.[28]  Plaintiff reported that his condition had deteriorated in the last 12 months, and that he finds himself fatigued all of the time.[29] Plaintiff said that during the past 12 months, he has not experienced a time when he could exceed the level of functionality or activity he described.[30]

On December 12 and 13, 2006, Triad conducted surveillance on Plaintiff's residence. The video of the surveillance was submitted to the Court along with Defendant's Motion.  On

---

[22]AR 397.

[23]*Id.*

[24]AR 397-98.

[25]AR 398.

[26]*Id.*

[27]AR 399.

[28]*Id.*

[29]*Id.*

[30]*Id.*

December 12, between 5:53 a.m. and 4:02 p.m., Plaintiff left his house for 1 hour and 55 minutes. While he was away from home, Plaintiff drove about 17 miles, visited and walked around two of his rental properties, and opened doors. On December 13, between 5:57 a.m. and 5:28 p.m., Plaintiff was observed outside of his house for 4 hours and 18 minutes. During that time, Plaintiff drove about 37 miles, walked at a normal pace, and stood for extended periods of time, among other activities. Plaintiff's activities in the video surveillance appeared to be inconsistent with the restrictions Plaintiff reported during his October, 2006, interview.

A February, 2007, letter from The Hartford asked Dr. Nease, Plaintiff's primary care physician, if he agreed with The Hartford's conclusion that Plaintiff could work in an occupation that required only sitting for the majority of an eight-hour day, provided that Plaintiff could move around as needed.[31] The Hartford based its conclusion on the interview with Plaintiff, the video surveillance, and Plaintiff's medical records.[32] On February 23, 2007, Dr. Nease wrote: "[Patient] has Hepatitis C which produced intermittent episodes of profound fatigue - he has good days and bad days - I do not see how he could perform a full-time job."[33]

The Hartford then asked Dr. Todd Lyon to review Plaintiff's claim and explain whether the evidence indicates that Plaintiff's functional capabilities may be greater than the described work.[34] Dr. Lyon reviewed medical records from Drs. Nease and Riely for the period of April 19, 2001, through February 23, 2007, the video surveillance, the interview report, and reports from

---

[31] AR 227-29.

[32] *Id.*

[33] AR 229.

[34] AR 241.

various studies, such as: bloodwork; biopsy results; electrocardiography; ultrasonography; CT scanning; MRI scanning; exercise treadmill testing; and myocardial perfusion scanning.[35] Dr. Lyon called Dr. Nease, but those calls apparently were not returned.

Dr. Lyon concluded that Plaintiff's "medical records do show chronic active hepatitis C of a mild to moderate severity. No doubt he does experience some fatigue in the face of this disease. However, his surveillance activities appear to be significant and suggest that he may not be severely limited by this fatigue."[36] Dr. Lyon also took into account MRI evidence of Plaintiff's lumbar degenerative disease, but concluded that Plaintiff's conditions do not preclude Plaintiff from engaging in seated activities.[37] Dr. Lyon determined that Plaintiff "is not precluded from and appears capable of full-time employment, which is primarily seated in nature, but which allows the freedom to change positions periodically throughout the day and require full use of his upper extremities and lifting up to 20 pounds occasionally and up to 10 pounds frequently."[38] After an Employability Assessment identified at least four occupations in which Plaintiff could be employed, The Hartford advised Plaintiff that his benefits would be terminated.[39]

---

[35] AR 241.

[36] AR 247.

[37] AR 248.

[38] *Id.*

[39] AR 129-33.

Plaintiff appealed the termination of his LTD benefits on October 1, 2007.[40] In support of his appeal, Plaintiff submitted a letter from Dr. Nease. Dr. Nease wrote that he saw a marked change in Plaintiff's condition from the time he started seeing Plaintiff in 1996.[41] Dr. Nease noted that Plaintiff's primary symptom was debilitating fatigue.[42] Dr. Nease advised Plaintiff in June, 2002, that with his medical problems, it was medically justifiable for Plaintiff to quit work at any time.[43] With respect to the video surveillance, Dr. Nease did not think that Plaintiff's activities on those days was a change from the symptoms Plaintiff reported earlier.[44] Dr. Nease explained:

> The problem with his condition is that he has some days in which he feels fair to poor and is able to be moderately active. But he has other days on which he is exceedingly fatigued and would not be able to work in any capacity. Unfortunately, hepatitis C does not produce any symptoms which are easily verifiable.[45]

Dr. Nease concluded that Plaintiff would not be able to hold down a regular job "because while he might have some days on which he could work fairly normally, he would have other days on which he would not be able to work at all."[46]

The Hartford then asked Dr. John Brusch to review Plaintiff's file. In November, 2007, Dr. Brusch reviewed all of Plaintiff's medical records -- except Dr. Lyon's report -- and the

---

[40]AR 232-33.

[41]AR 234.

[42]*Id.*

[43]*Id.*

[44]*Id.*

[45]*Id.*

[46]AR 235.

video surveillance. Dr. Brusch apparently tried five times to contact Dr. Nease, but was unsuccessful. Dr. Brusch was asked to determine if the information provided for review documented that Plaintiff was precluded from working full time.[47] Dr. Brusch determined that Plaintiff was not limited from working full time.[48]

In a December 17, 2007, letter, The Hartford affirmed its denial of Plaintiff's claim. Plaintiff then filed this case.

### III.    DISCUSSION

####    A.    Standard of Review

Under ERISA, "[a] civil action may be brought by a participant or beneficiary . . . to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits . . . ."[49] A denial of benefits under a plan governed by ERISA is to be reviewed *de novo*, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[50] When an ERISA plan grants discretion, courts review a plan administrator's decision under an abuse of discretion standard.[51] A plan administrator's decision will be reversed under an abuse of discretion standard "'only if it is arbitrary and capricious.'"[52] When the

---

[47]AR 276.

[48]AR 277.

[49]29 U.S.C. § 1132(a)(1)(B).

[50]*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

[51]*Jessup v. Alcoa*, 481 F.3d 1004, 1006 (8th Cir. 2007).

[52]*Groves v. Metro. Life Ins. Co.*, 438 F.3d 872, 874 (8th Cir. 2007) (quoting *Herbert v. SBC Pension Benefit Plan*, 354 F.3d 796, 799 (8th Cir. 2004)).

insurance company "both determines whether an employee is eligible for benefit and pays benefits out of its own pocket," there is a conflict of interest, which should be taken into consideration when determining whether there was an abuse of discretion.[53]

Plaintiff maintains that the Plan grants discretion only "to the School as plan administrator and to other plan fiduciaries";[54] that The Hartford is not a plan fiduciary or plan administrator; and that The Hartford's decision terminating Plaintiff's LTD benefits should be reviewed *de novo*.

The summary plan description identifies St. Mary's Episcopal School as the plan administrator, and states: "[t]he Administrator and other Plan fiduciaries have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to benefits in accordance with the Plan."[55] The Group Long Term Disability Certificate reads, in relevant part: "[w]hen making a benefit determination under the policy, *We* have discretionary authority to deter *Your* eligibility for benefits and to interpret the terms and provisions of the policy."[56] "We" is defined as the Continental Casualty Company.[57] The Plan identifies the School as the plan administrator, and grants The Hartford discretion.

---

[53]*Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2346 (2008).

[54]Doc. No. 16.

[55]AR 22.

[56]AR 9 (emphasis in original).

[57]AR 21.

The plan in *Rud v. Liberty Life Assur. Co.*[58] also identified the employer as plan administrator and granted authority to the insurance company. The Eighth Circuit Court of Appeals noted that it may seem odd that one entity administers the plan, when another entity is the plan administrator.[59] But the Eighth Circuit pointed out that the insurance company was granted the discretion to determine eligibility, making the insurance company an ERISA fiduciary.[60]

This case is similar to *Rud*. The Hartford is an ERISA fiduciary, and since the Plan grants discretion to The Hartford, the abuse of discretion standard applies here.

**B.    Defendant's Decision to Deny Plaintiff's LTD Benefits**

As set out above, a plan administrator's decision will be reversed under an abuse of discretion standard "'only if it is arbitrary and capricious.'"[61] According to Webster's Dictionary, arbitrary means based on impulse or whim;[62] capricious means characterized by or subject to whim.[63] A plan administrator's decision "need be only reasonable, meaning that it must be supported by substantial evidence."[64] A plan administrator's decision need not give more weight

---

[58] 438 F.3d 772, 774 (8th Cir. 2006).

[59] *Id.*

[60] *Id.*

[61] *Groves*, 438 F.3d at 874.

[62] WEBSTER'S NEW RIVERSIDE DICTIONARY 37 (Revised Edition 1996).

[63] WEBSTER'S NEW RIVERSIDE DICTIONARY 106 (Revised Edition 1996).

[64] *Alexander v. Trane Co.*, 453 F.3d 1027, 1031 (8th Cir. 2006).

to a treating physician's opinion.[65] Peer review of a treating physician's records is an accepted method of review.[66] If a plan administrator's decision is based on relevant evidence that a reasonable person could find supports the conclusion, the decision should be upheld.[67]

Plaintiff maintains that he is entitled to LTD benefits. Defendants contend that The Hartford's decision to deny Plaintiff's LTD benefits was based on a lack of objective evidence that Plaintiff's diagnosed condition supports Plaintiff's alleged restrictions.[68]

There is substantial evidence in the record to support The Hartford's conclusion. The Hartford reviewed Plaintiff's medical records, and had Dr. Lyon review Plaintiff's medical records, before terminating Plaintiff's benefits. In addition to the medical records, The Hartford compared the answers Plaintiff provided during his October, 2006, interview with the surveillance captured on video. The Hartford determined that Plaintiff was capable of working full time in at least four occupations, and consequently denied Plaintiff's claim.

On appeal, Dr. Brusch also reviewed Plaintiff's medical records, the results of the interview, and the surveillance, and also concluded that Plaintiff could work full time. The letter from Dr. Nease that Plaintiff submitted in support of his appeal identified Plaintiff's subjective fatigue as the reason why Plaintiff cannot work. Dr. Brusch considered Dr. Nease's opinion, along with other objective evidence, before he determined Plaintiff could work. After receiving Dr. Brusch's review of Plaintiff's file, The Hartford affirmed its decision denying Plaintiff's

---

[65]See *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003).

[66]See *Dillard's Inc. v. Liberty Life Assur. Co.*, 456 F.3d 894 (8th Cir. 2006); *Weidner v. Fed. Express Corp.*, 492 F.3d 925 (8th Cir. 2007).

[67]See *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994 (8th Cir. 2005).

[68]Doc. No. 17.

LTD benefits. Because The Hartford's decision was based on relevant evidence that a reasonable person could find supports its conclusion, the decision to terminate Plaintiff's benefits was not arbitrary and capricious. Accordingly, Defendants' Motion for Summary Judgment is GRANTED.

## CONCLUSION

Based on the finding of fact and conclusions of law above, Defendants' Motion for Summary Judgment (Doc. No. 18) is GRANTED, Plaintiff's Motion for Summary Judgment (Doc. No. 15) is DENIED, and this case is DISMISSED.

IT IS SO ORDERED this 12th day of November, 2009.

/s/Wm. R. Wilson, Jr.
UNITED STATES DISTRICT JUDGE